# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 07-61920-CIV-DIMITROULEAS/ROSENBAUM

TRACIE M. SCHIANO,

       Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

### *I. INTRODUCTION*

This matter is before the Court on the cross-motions for summary judgment filed, respectively, by Plaintiff Tracie M. Schiano ("Claimant") [D.E. 13] and by Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner") [D.E. 18]. Pursuant to 28 U.S.C. §636 and Magistrate Rules 1(c) and (d), Local Rules of the United States District Court for the Southern District of Florida, the Honorable William P. Dimitrouleas referred the motions to me for report and recommendation. [D.E. 4].

The cross-motions present the issue of whether substantial evidence exists to support the determination by the Administrative Law Judge ("ALJ") that Claimant retains the residual functional capacity to engage in light duty work. Under the limited standard of review that governs this case, I conclude that the ALJ's decision is supported by substantial evidence. Consequently, I recommend that the Court deny Plaintiff's Motion for Summary Judgment [D.E. 13] and grant Defendant's

Motion for Summary Judgment [D.E. 18].

## II. PROCEDURAL HISTORY

Claimant filed an application for disability insurance benefits on January 31, 2005, under Title II of the Social Security Act ("Act"), 42 U.S.C. §§401, *et seq.* Administrative Record ("Tr."), 45. In her application, Claimant alleged that she had been disabled since March 15, 2004. *Id.* Claimant met the insured status requirements of the Act and was fully insured through December 31, 2008. Tr. 14. 59.

The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. Tr. 34, 33. Thereafter, on September 21, 2005, Claimant requested and was granted a hearing before an ALJ. Tr. 28, 22. On October 11, 2006, ALJ M. Dwight Evans held a hearing on Claimant's application. Tr. 331. In a decision dated November 21, 2006, Judge Evans denied Claimant's application, finding that she was not under a "disability," as defined in the Act. Tr. 21.

Claimant then requested review by the Appeals Council of the ALJ's unfavorable decision. Tr. 10. On November 2, 2007, the Appeals Council denied Claimant's request, allowing the ALJ's decision to stand as the final decision of the Commissioner. Tr. 4.

On December 28, 2007, Claimant filed the Complaint in this case [D.E. 1] seeking reversal of the Commissioner's final decision. The Commissioner filed his Answer on April 1, 2008. [D.E. 10]. Thereafter, on June 9, 2008, Claimant filed her Motion for Summary Judgment. [D.E. 13]. In that Motion, Claimant alleged the following errors on the part of the Commissioner:

1.  The Commissioner erred in discounting the opinions of Claimant's treating neurologist Melvin Grossman, M.D., and neuropsychologist Allan Ribbler, Ph.D.;

2.  The Commissioner erred in concluding that Claimant can perform her past work as an office manager; and

      3.     The Commission erred in conducting his credibility analysis of Claimant and her testimony.

D.E. 13-3.

On September 5, 2008, the Commissioner filed his Motion for Summary Judgment and responded to Claimant's motion, arguing that no error had occurred. [D.E. 18]. Claimant filed her reply on September 15, 2008. [D.E. 19]. The Court held a hearing in this matter on February 12, 2009. This case is now ripe for consideration.

### III.  FACTS

**A.**    **<u>General Background</u>**

Claimant was born on August 31, 1961, and was 42 years old on March 15, 2004, the time of the onset of her claimed disability. Tr. 45. Although Claimant left school before graduating, she subsequently obtained her General Equivalency Diploma. Tr. 308. While Claimant was not working at the time of application or thereafter, she has past relevant work experience as an office manager. More specifically, from 1991 until April 30, 2003, Claimant was a full-time office manager of Commercial Driver Services, a temporary labor agency that supplied certified commercial truck drivers. Tr. 109. Claimant was a part-owner of this business from 1991 until 2002. *Id.* In her capacity as the office manager, Claimant spent most of her time sitting to speak on the telephone, type contracts, and perform other office work. *Id.* She spent the remainder of her time standing, walking, bending, stooping, reaching, grasping, pushing and pulling drawers for filing purposes, and carrying stacks of files and papers. *Id.* During the last two years that Claimant worked at Commercial Driver Services, Claimant spent all of her time sitting to answer the telephones and perform bookkeeping services. *Id.* According to Claimant, her position required her to lift up to 10

pounds frequently and, in the earlier years of her job, up to 30 pounds occasionally.  *Id.*

According to Louis Gaetano, the president and owner of Commercial Driver Services, Claimant originally owned 50% of the stock in the company.  Tr. 57.  Instead of buying Claimant out for a lump sum, Gaetano stated that he and Claimant decided that Gaetano would purchase Claimant's shares in the company by paying Claimant a "weekly salary" over a period of time.  *Id.* More specifically, from December, 2002, through May, 2003, Commercial Driver Services paid Claimant $600.00 per week in payment of Claimant's shares in the company.  *Id.*  In reality, however, Gaetano indicated, he could have hired an employee to perform the work Claimant did during that period for a total of $50.00 to $100.00 per week, based on an hourly rate of $10.00.  *Id.* Gaetano explained that he allowed Claimant to work for fewer hours during that period because of her medical condition.  *Id.*

Prior to owning Commercial Driver Services, Claimant served as a traffic controller for three years, and then as a fleet manager for the next five years, with Ryder Transportation Services.  Tr. 109, 110.  In this position, Claimant spent about 70% of her time sitting to speak on the telephone and to input information into the computer. Tr. 110.  Additionally, she drove to different dealerships and gas stations to perform audits.  *Id.*  As for the remaining 30% of the time, Claimant stood, walked, stooped, bent, reached, pushed, pulled, and grasped to obtain and return files.  *Id.*  Part of Claimant's responsibilities required her to update large plexiglass maps and boards with all of the information about the status of the truck inventory.  *Id.*

According to Claimant, she has been unable to work as a result of various ailments.  Among her symptoms, Claimant alleges that she suffers from "overwhelming fatigue, swelling[,] burning feet, migraines[,] numbness [of the] right leg[,] back [and] neck spasms[,] difficulty turning [her]

head[,] throbbing neck pain [on the] left side[,] difficulty sitting/standing for any period of time[,] swelling hands, loss of dexterity[,] [and] difficulty concentrating." Tr. 73.  During the course of her application, Claimant also complained that she suffers from depression, anxiety, and other mental impairments.

### B.   *Medical Evidence*

The transcript in this matter contains medical records of Claimant dating back to 1997. Claimant's alleged date of disability onset did not occur until March 15, 2004.  Therefore, although the Court will review records from prior to this date in order to place the later medical records in context, the Court will focus primarily on records from March 15, 2004, forward.

From August 5, 1997, through April 15, 2004, Claimant saw Melvin Grossman, M.D., on numerous occasions for various ailments.[1]  On September 12, 1997, in a letter to another doctor, Dr. Grossman referred to a magnetic resonance imaging ("MRI") scan of Claimant's neck, noting that it revealed multiple areas of spondylitic or arthritic disease with foraminal narrowing primarily at C3-4.  Tr. 250.  Additionally, Dr. Grossman indicated, the MRI reflected disk bulging with spondyilitic changes at C4-5 and C5-6 and small, left-sided disk herniation with mild osteophytes at C6-7.  *Id.*  Although Dr. Grossman opined that "[t]his certainly would explain neck pain in this young lady," he, nevertheless, concluded, "The examination again on this patient is quite normal. There is no real true neuropathology seen nor any true restriction or spasm though obviously the MRI scan tends to acknowledge a slight degenerative process.  I have told the patient she is free to return as needed but I don't believe any further neurological care would be warranted. . . ."  *Id.*

---

[1]The transcript contains Dr. Grossman's records from these visits.  In the progress notes of Hugo De Ayala, M.D., however, Dr. De Ayala indicated that Claimant had advised him that she began seeing Dr. Grossman prior to this time, in 1995 to 1996.  Tr. 204.

In a letter dated January 26, 1999, from Dr. Grossman to another doctor, Dr. Grossman noted Claimant's complaints of "a modicum of left neck pain, headaches, joint aches and pains, [and lower back pain]."  Tr. 248.  While he indicated that Claimant's difficulty in moving her neck was "apparent," he further described Claimant as suffering from no acute distress or spasms and characterized her neck as "supple" and her examination as "normal."  *Id.*  In summation, Dr. Grossman opined, "Patient's complaints are subjective . . . ."  *Id.*

A few months later, on July 27, 1999, Dr. Grossman sent a letter to HIP Insurance.  Tr. 246.  In this letter, after cataloguing Claimant's symptoms and describing all therapies prescribed for Claimant as "without effect," Dr. Grossman stated, "The patient does work full-time owning and operating a business and this combination has been rewarding for her so that she can continue working in a gainful employ, supporting herself."  *Id.*

Similarly, in his appointments with Claimant during the year 2000, although Dr. Grossman acknowledged Claimant's self-described pain symptoms and indicated that "[d]iscomfort on cervical and lumbar range [was] apparent," Tr. 244, he found Claimant to be in no acute distress and characterized cranial nerve, motor, sensory, cerebellar testing, and nerves II-XII as "normal."  Tr. 244, 242.  In a November 2, 2000, letter to Larry Levinson, D.O., Dr. Grossman noted that Claimant was "under a lot of stress having some financial concerns as her business [was] not doing as well as she'd like."  Tr. 242.

On January 30, 2001, Dr. Grossman stated in a letter to another doctor that Claimant had, in the intervening time, seen a pain specialist named Dr. Millone, "who said there was not[h]ing wrong with her. . . ."  Tr. 240.  In this same letter, while Dr. Grossman indicated that MRI scans performed on March 10, 2000, showed certain conditions that Dr. Grossman described as "significant" and

"suggesting degenerative disease," he further reported that Claimant was in no acute distress, her neck was supple, and Dr. Grossman observed no spasms. *Id.* Finally, Dr. Grossman suggested that Claimant "again may wish to be seen by a pain management specialist to address her chronic neck and back aches which do[] not seem to reflect ongoing neuropathology." *Id.*

Later that same year, on July 6, 2001, Dr. Grossman indicated in a letter to Dr. Levinson that despite Claimant's complaints, he found her to have no acute distress, observed her neck to be "supple," and her cranial nerve, motor, sensory, and cerebellar examinations to be "normal." Tr. 238. In conclusion, Dr. Grossman reported, "I don't believe I see any objective findings at the present time, except for discomfort. She is seeing a therapist who suggested she go on some Prozac and felt a lot of her complaints were supratentorial, but this remains to be seen." *Id.*

Beginning in May, 2002, Claimant started seeing Barry K. Waters, M.D., a rheumatologist. Tr. 133. Following his examination of Claimant on May 30, 2002, Dr. Waters opined that "[m]ost likely, [Claimant was] coming down with rheumatoid arthritis." Tr. 133. He indicated his intention to wait for test results to come back to confirm a diagnosis of rheumatoid arthritis, suggesting that if arthritis were indicated, he would prescribe possibly Plaquenil.[2] Tr. 134.

At Claimant's next visit with Dr. Waters, which occurred on June 11, 2002, Dr. Waters did, indeed, prescribe Plaquenil for Claimant. Tr. 132. He further reported in his treatment notes that Claimant complained of severe fatigue, joint pain, especially in her neck and left shoulder blade, parasthesias (feeling of pins and needles), and depression, although Dr. Waters characterized Claimant as "[h]ealthy [a]ppearing." Tr. 130. In his assessment, Dr. Waters theorized that Claimant

---

[2]Plaquenil, a trade name for hydroxychloroquine sulfate, is indicated for the treatment of, among other conditions, rheumatoid arthritis. http://www.rxlist.com/plaquenil-drug.htm.

suffered from chronic pain syndrome, or fibromyalgia syndrome ("FMS").  Tr. 131.

Claimant visited Dr. Waters again in July and September, 2002.  Tr. 126, 138, 123, 124.  By September, 2002, Claimant reported "[f]eeling much better – much less pain in hands & feet."  Tr. 124.  Dr. Waters observed that Claimant's rheumatoid arthritis was "doing well," although Claimant was noncompliant with respect to her spinal problems, and she was "not doing well."  *Id.* Additionally, Dr. Waters referred Claimant to Andrew Goldberg, M.D., a pain management anesthesiologist.  *Id.*  Dr. Waters's treatment notes further reflect that Claimant canceled two appointments in December.  *Id.*

In Dr. Waters's January 23, 2003, treatment notes, he indicated that Plaquenil "helped a lot," but Dr. Waters discontinued the prescription because Claimant advised that her vision had been blurring a bit.  Tr. 121.  Consequently, Dr. Waters held the Plaquenil prescription, pending clearance from the ophthalmologist.  *Id.*

On February 26, 2003, Claimant returned to Dr. Grossman.  Tr. 164, 232.  At that time Dr. Grossman advised Claimant to consider physical therapy.  *Id.*  He further reported that Dr. Waters had put Claimant back on Plaquenil and that while Claimant exhibited discomfort on the extremes of cervical motion, Dr. Grossman's examination of her was otherwise nonfocal and preserved. According to Dr. Grossman, Claimant informed him that she planned to retire and take off at least six months, allowing her to "get her rest."  *Id.*

On March 25, 2003, Claimant visited Andrew J. Goldberg, M.D.  In his notes from this visit, Dr. Goldberg documented Claimant's complaints of diffuse pain, with the majority of her pain occurring in the left neck and shoulder, radiating down the left arm.  Tr. 161.  As a result of cervical radiculopathy associated with cervical disk herniation and cervical facet arthropathy, Dr. Goldberg

recommended previously (in October, 2002) that Claimant receive left cervical transforaminal epidural steroid injections, but Claimant did not follow through with this recommendation. *Id.* According to Dr. Goldberg, at the March 25, 2003, appointment, Claimant denied any nausea, vomiting, drowsiness, or constipation stemming from her use of the drugs Vioxx, Oxycontin, and Plaquenil. *Id.* Dr. Goldberg's notes further reflect that Claimant advised him that she was leaving her job because she felt that she could reduce her need for narcotics by changing her career. *Id.* Dr. Goldberg also observed pain with left neck rotation, although he found Claimant to have a right neck rotation to 90 degrees without discomfort, and he described Claimant's range of motion for her shoulders to be normal. *Id.* To address Claimant's ailments, Dr. Goldberg recommended an array of treatments from conservative to more aggressive, including repeat physical therapy, anti-inflammatory drugs, a Lidoderm patch, and epidural steroid injections. *Id.* The transcript contains no records of additional visits by Claimant to Dr. Goldberg.

Claimant again returned to Dr. Grossman on May 30, 2003. Tr. 158. At that time, Dr. Grossman noted that Claimant was continuing to take Plaquenil for her arthritis and further documented that she was taking Vioxx and Oxycontin and using the Lidoderm patch. *Id.* Upon examination of Claimant, Dr. Grossman observed Claimant not to be in acute distress, describing her neck as "supple" and the cranial nerve, motor, sensory, and cerebellar examinations to be "normal." *Id.* Dr. Grossman likewise found Claimant's deep tendon reflexes to be symmetrical and her speech to be "fluent." *Id.*

In the transcript, Claimant made her next visit to Dr. Grossman approximately nine months later, on March 4, 2004. At that time Dr. Grossman reviewed an MRI scan of Claimant's lumbar spine from February, 2004. Tr. 231. Although Dr. Grossman characterized the February, 2004,

lumbar spine MRI scan as "abnormal with multiple areas of bulging" and revealing "an L3-4 left sided annular tear of the soft tissue within the left neural foramen," he reported that his physical examination of Claimant on March 4, 2004, was "unchanged." *Id.*

The following month, on April 15, 2004, or one month after the alleged onset date of Claimant's disability, Dr. Grossman apparently saw Claimant for the last time. Tr. 230. Based on Dr. Grossman's notes, Claimant was scheduled to see Dr. Stauber, who was going to order MRI scans of both the cervical and thoracic spine. Tr. 230. Upon Dr. Grossman's review of the February, 2004, lumbar spine MRI scan, Dr. Grossman opined that he did not "think there's very much there although she does have degenerative dis[k] disease at multiple levels." *Id.* Dr. Grossman added that Claimant had been calling him requesting that he increase her OxyContin, which Dr. Grossman was "not really comfortable doing." *Id.* Based on these events, Dr. Grossman recommended that Claimant be seen by a pain specialist, "as there [ was] very little [he] could do for her," and he was "really not comfortable continuing to see her." *Id.*

A year and one-half later, on October 21, 2005, Dr. Grossman prepared a physical capacities evaluation for Claimant. *See* Tr. 228. In this assessment, Dr. Grossman opined that Claimant could sit and stand and/or walk for one hour on a sustained basis in an eight-hour work day. *Id.* He further concluded that Claimant could occasionally lift up to ten pounds, but never lift more. *Id.* Although Dr. Grossman indicated that Claimant could engage in simple grasping, he determined that she could neither push nor pull arm controls, nor engage in fine manipulation on a sustained basis. *Id.* Similarly, Dr. Grossman indicated that Claimant could not use her feet for repetitive movements on a sustained basis and that she required one hour of rest for each hour of activity. *Id.* While Dr. Grossman's evaluation contains additional comments, other than to attribute certain symptoms to

-10-

"muscle spasm," it does not appear to refer for support for these conclusions to any test results or other medical evidence. *See, generally,* Tr. 228-29.

Returning to the chronological recitation of Claimant's medical visits of record, on May 3, 2004, Claimant visited Hugo De Ayala, M.D., for the first time. *See* Tr. 203. At that time Claimant described her problems as including "pain, swelling, limited movement, problems sleeping." Tr. 208. She further indicated that she suffered from depression, forgetfulness, headaches, loss of sleep, loss of weight, and numbness. Tr. 211. Dr. De Ayala took Claimant's medical history and assessed Claimant as suffering from lumbago, sciatica, cervicalgia, neuralgia/neuritis, and anxiety states – NOS (not otherwise specified), although he noted that Claimant was "[n]ot currently treated by a psychiatrist." Tr. 203-04. Claimant signed a document entitled, "Contract for Pain Management and Treatment," in which she pledged, "If I feel tired or mentally foggy, I will not drive, operate machinery or serve in any manner related to the public's safety." Tr. 212. During the same visit, Dr. De Ayala prescribed a number of medications, including, among others, Soma, Xanax, Vioxx, Oxycontin, and Roxicodone. Tr. 201-02.

A couple of days later, on May 5, 2004, Claimant wrote Dr. Grossman a letter in which she informed him that she had started seeing Dr. De Ayala. Additionally, Claimant stated that she had also visited Dr. Stauber, who "felt from a surgical standpoint that nothing conclusive could be gained from a surgical procedure. He also felt the mass that was apparent on the lumbar MRI that [Dr. Grossman] had ordered for [Claimant] was composed of dis[k] fragments and no further tests or action were needed." Tr. 199.

Claimant again visited Dr. De Ayala on July 26, 2004. Tr. 196. At that time she advised Dr. De Ayala that she had no complaints and described her pain as "stable." *Id.* He again assessed

Claimant as suffering from lumbago, sciatica, cervicalgia, neuralgia/neuritis, and anxiety states –

NOS, and continued Claimant on the same medications as previously.  Tr. 197-98.

On August 26, 2004, and March 24, 2005, Claimant again saw Dr. De Ayala.  Tr. 194.  As

he had during prior visits, Dr. De Ayala assessed Claimant as suffering from lumbago, sciatica,

cervicalgia, neuralgia/neuritis, and anxiety states – NOS, and renewed her prescriptions.  Tr. 194-95;

Tr. 191-92; *see* Tr. 193, 197.

On March 28, 2005, Dr. De Ayala sent a facsimile to the Florida Department of Health Office

of Disability Determination in response to an inquiry regarding Claimant.  In this note, Dr. De Ayala

stated, "Enclosed are copies of pertinent medical records that bridge a gap of care from 5/04 to last

visit of 3/24/05.  I do not perform an additional exam for disability ratings.  Pt. must see a Disability

Rehabilitation Specialist."[3]  Tr. 205.

Consistent with this suggestion, the transcript reflects that Claimant underwent a consultative

examination by Michele Morrison, M.D., on April 25, 2005.  Tr. 173.  Dr. Morrison concluded that

Claimant was a "well-developed and well-nourished female in no acute distress."  *Id.*  She found that

Claimant was awake, alert, and oriented, and described Claimant as "relat[ing] well with the office

staff and . . . cooperative with the physical examination."  *Id.*  While at one point in her notes Dr.

Morrison described Claimant as walking with a steady gait, she later indicated the opposite, although

Dr. Morrison observed that Claimant was able to perform toe and heel walking.  *Id.*  As for the rest

of the exam, Dr. Morrison observed Claimant's neck to be supple, and Dr. Morrison found no

tenderness, swelling, or heat at the cervical spine.  *Id.*  She likewise observed Claimant's back to

---

[3]Dr. De Ayala offered a similar response to an agency inquiry on July 21, 2005.  Tr. 188.
At that time, he stated, "I do not perform nor write anything about Disability Determination.
Please refer patient to a physical rehab or other specialist that does this.  Thanks."  *Id.*

have normal curvature with no spinous process, redness, heat, swelling, or inflammation.  *Id.*  With respect to Claimant's range of motion, Dr. Morrison judged it to be normal, although she noted that rotation evoked minor pain to Claimant's neck.  *Id.*  Dr. Morrison also determined that Claimant could perform a complete straight leg raise and was able to turn a doorknob with both hands.  *Id.* According to Dr. Morrison, Claimant's grip strength and leg strength were each at 5/5 with no muscle atrophy.  *Id.*  Dr. Morrison also noted that Claimant was capable of answering questions appropriately and with clarity, as well as of sustaining concentration during conversation.  *Id.*  Based on her examination of Claimant, Dr. Morrison found Claimant's affect to be normal and her mood pleasant.  *Id.*

On May 12, 2005, Dr. De Ayala provided a response to an inquiry from the Florida Department of Health Office of Disability Determination asking whether Dr. De Ayala felt that Claimant suffered from a mental impairment that significantly interferes with daily functioning, whether Dr. De Ayala had referred Claimant for formal psychiatric or psychological treatment, and whether Dr. De Ayala had prescribed any medication for Claimant's mental condition.  Tr. 190.  Dr. De Ayala replied in the negative to all three questions.  *Id.*

On July 21, 2005, Padeitra Moorer, SDM, prepared a Physical Residual Functional Capacity Assessment of Claimant.  Tr. 180.  In that document, Moorer opined that Claimant can occasionally lift 20 pounds and frequently lift 10 pounds, stand and/or walk for about six hours in an 8-hour work day, and sit for about six hours in an eight-hour work day, with no limitations on her ability to push and/or pull.  Tr. 181.  In support of this conclusion, Moorer pointed to Dr. Morrison's findings that Claimant's back has normal curvature with no spinous process, redness, heat, swelling, or inflammation, that Claimant suffers from no peripheral edema, that her straight-leg raising test was

-13-

negative, that her neuro and sensory were intact, and that Claimant enjoys grip strength and leg strength of 5/5 bilaterally with no muscle atrophy. *Id.* Although Moorer specifically acknowledged that Dr. Morrison had described Claimant's gait as unsteady, Moorer, nonetheless, noted that Dr. Morrison indicated that Claimant can walk without assistance and that her range of motion falls within normal limits. *Id.* Moorer concluded that Claimant suffered from no other limitations. Tr. 182-85. As for Claimant's subjective complaints, Moorer opined that she was "[p]artially credible," noting that at her examination, Claimant's ranges of motion were normal, and Dr. Morrison observed no swelling of the joints. Tr. 185.

Returning to Claimant's medical visits, between August 19, and December 16, 2005, Claimant went to Dr. De Ayala five more times. Tr. 280-305. On each of these visits, Dr. De Ayala assessed Claimant as suffering from lumbago, sciatica, cervicalgia, neuralgia/neuritis, and anxiety states – NOS, as he had in her prior appointments, and continued her prescription medications. *See id.* Claimant reported "no complaints" during her November and December, 2005, appointments. Tr. 282-83.

Also during this time, Claimant saw Allan Ribbler, Ph.D., for a neuropsychological evaluation, upon the advice of her attorney. Tr. 308. Dr. Ribbler prepared an assessment of Claimant based on four days of testing in December, 2005. *Id.* The assessment included background information provided by Claimant to Dr. Ribbler, as well as Dr. Ribbler's interpretation of the results of several tests he administered to her. *See* Tr. 308-18.

With regard to the information Claimant provided, Dr. Ribbler reported that Claimant stated that in her leisure time, in the past, she has enjoyed boating and going out to eat, although she has

-14-

lost friends since experiencing her physical and psychological ailments.[4]  Tr. 308.  Claimant advised

Dr. Ribbler that she suffers from rheumatoid arthritis and degenerative joint disease.  *Id.*  According

to Claimant, she has weakness intermittently in both hands and lower extremities and experiences

tingling in the extremities.  Tr. 309.  Dr. Ribbler further recorded Claimant's statements that she has

trouble with balance, although it is better than it has been.  *Id.*  While Claimant described her manual

dexterity as usually adequate for activities of daily living, Claimant indicated that she has difficulty

putting on and taking off jewelry.  *Id.*  Claimant further advised Dr. Ribbler that she has nausea at

times secondary to medication, and her appetite is decreased.  *Id.*  While Claimant denied any

problems with fainting, she told Dr. Ribbler that she experiences periodic dizziness.  *Id.*

Additionally, Claimant reported that she has suffered from migraine headaches for the past ten years,

although they have improved recently to a frequency of once a month.  *Id.*

With respect to cognitive abilities, Claimant denied any problems with auditory

comprehension or word finding, and confirmed that her handwriting remains the same.  Tr. 309.

Likewise, she explained that her reading, reading comprehension, and calculation abilities are not

impaired.  *Id.*  Nevertheless, Claimant reported that she has "significant problems with

concentration" and advised that she similarly had endured "poor concentration" problems during her

school years.  Additionally, Claimant stated that she is "inconsistent in her ability to complete

household chores."  *Id.*  Claimant also told Dr. Ribbler that she has a decreased memory for recent

events, is "rather distractible," and experiences difficulty with sleep maintenance.  *Id.*

---

[4]In Dr. Ribbler's raw notes, however, he appears to have indicated that Claimant
described her social activities at the time of the interview as then including boating and going out
to eat and related that her relationship with her spouse and family members at the time of the
interview was "good."  Tr. 320.

As to her mental state, Claimant reported "significant depression, so severe that she had been suicidal." Tr. 309.  Dr. Ribbler explained, however, that Claimant began taking SAM-E and advised him of "significant improvement in her mood."  Nonetheless, however, Dr. Ribbler noted, Claimant "continues to be very depressed, irritable, tense and fatigues very easily."  *Id.*  Despite these mental symptoms reported by Claimant, prior to seeing Dr. Ribbler, Claimant explained, she had never visited a psychiatrist or psychologist.  *Id.*

In addition to conducting a clinical interview of Claimant, Dr. Ribbler administered the following tests: (1) Test of Memory Malingering; (2) Shipley Institute of Living Scales; (3) Wide Range Achievement Test - 3 (Reading and Arithmetic); (4) Wechsler Adult Intelligence Scale - III; (5) Wisconsin Card Sorting Test; (6) Test of Perceptual Organization; (7) Grooved Pegboard Test; (8) Rey Complex Figure Test; (9) Boston Naming Test; (10) Controlled Oral Word Association Test; (11) Trail Making Test - Parts A and B; (12) Conner's Continuous Performance Test - II; (13) McGill Pain Questionnaire; (14) Pain Patient Profile; and (15) Personality Assessment Inventory ("PAI").  Tr. 310.  He observed that while Claimant took these tests, she took breaks to stand up and move around approximately every twenty minutes, at times becoming frustrated and tearful.  *Id.*

With regard to Claimant's test-taking effort, based on the results of the Test of Memory Malingering, which indicated that she scored "above the cutoff for suspected malingering," Dr. Ribbler concluded that Claimant had "put[] forth her best effort" on the test, and, by extension, that she had "put forth her best effort on other tests of cognitive ability."  Tr. 310.  As for the results of tests measuring cognitive and intellectual functioning, Dr. Ribbler described Claimant's scores as placing her in the average range of general intellectual ability, but noted that Claimant demonstrated "a significant strength in her ability to process verbal information" and "a strength in her Working

-16-

Memory performance." Tr. 311.  He found Claimant's Processing Speed to fall in the "borderline range."  *Id.*  Based on a comparison of Claimant's results, Dr. Ribbler concluded that Claimant demonstrated a "relative strength in her ability to retain and sequence letters and numbers, a reflection of her strong working memory."  *Id.*

On the Wisconsin Card Sorting Test, Claimant scored in the low average range and demonstrated "difficulty testing alternative solutions to problems when sorting rules would change without notice." Tr. 312.  Although Claimant completed the Test of Perceptual Organization "rather quickly," she scored within the severely impaired range, which Dr. Ribbler stated suggested "some difficulty following specific written instructions as well as reading comprehension."  *Id.*

In describing Claimant physically, Dr. Ribbler noted that Claimant walks with "an obvious limp." Tr. 312.  As for the Grooved Pegboard Test, Dr. Ribbler found Claimant's performance to show her fine motor speed and coordination to be moderately impaired with the dominant left hand.[5] *Id.*  He likewise described Claimant's visual motor coordination to be "severely impaired," falling below the first percentile," although her copy time was average.  *Id.*

With regard to Claimant's language functions, Dr. Ribbler observed that Claimant has "no difficulty with conversational speech" and is "able to follow test instructions without any particular difficulty." Tr. 312.  As for Claimant's attentional functions, in contrast to his statement earlier in his report that Claimant could work for twenty minutes at a time before getting up to move around, Dr. Ribbler reported that Claimant was "able to work for periods of up to about thirty minutes before

---

[5]The report actually refers to the "dominant right hand," but the prior sentence states that Claimant is "left hand dominant for unimanual tasks," and the subsequent sentence refers to the "nondominant right hand." Tr. 312.  Consequently, the Court concludes that the reference to the "dominant right hand" in the sentence appearing between these two sentences constitutes a scrivener's error, and Dr. Ribbler intended instead to write "dominant left hand."

requiring a break to get up and move around.  This was primarily because of pain from her arthritis." *Id.*

Dr. Ribbler also tested Claimant's memory functions.  *See* Tr. 313.  While Claimant tested generally in the average range, she showed "mildly deficient performance on immediate and delayed recall of Family Pictures." *Id.*  Dr. Ribbler offered, however, that "[p]art of the problem seemed to be fatigue by the time she got to that portion of the test. . . ," noting that on verbal memory testing, Claimant had no impairment for either recall or recognition.  *Id.*  On non-verbal memory, on the other hand, Claimant fell in the "severely impaired range for both immediate and delayed recall." Tr. 314.

In the psychosocial functioning testing, Claimant indicated pain across the back of her shoulder and down her cervical and thoracic spine, as well as pain in her finger tips.  Tr. 314. Additionally, her "Pain Drawing" showed pain across her lower back with radiation into her buttocks and across her lower abdomen.  *Id.*  Claimant also indicated pain in "the interior aspect of her knees bilaterally," her ankles, heals, and toes.  *Id.*  With regard to associated symptoms, Claimant described nausea, headache, dizziness, drowsiness, constipation, and fitful sleep.  *Id.*  Interpreting Claimant's "total pain score," Dr. Ribbler concluded that it was "higher than the typical pain complaint seen by arthritis patient[]s." *Id.*  Similarly, Dr. Ribbler found Claimant's "depression score" to be "significantly higher than that seen for chronic pain patients," although her anxiety score was average for chronic pain patients and her somatization score was less than a standard deviation above the mean for chronic pain patients.  *Id.*  Dr. Ribbler opined that Claimant's responses on the Pain Patient Profile resulted in a "valid profile." *Id.*

With regard to the PAI, Dr. Ribbler determined that Claimant's scoring suggests "significant

distress, with particular concerns about her physical functioning.  She sees her life as severely disrupted by a variety of physical problems.  These problems have left her unhappy, with little energy or enthusiasm for concentrating on important life tasks and little hope for improvement in the future."  *Id.*  Indeed, Dr. Ribbler opined that Claimant "demonstrates a degree of somatic concerns that is unusual even in clinical samples.  Such a score suggests a ruminative preoccupation with physical functioning and health matters and severe impairment arising from somatic symptoms.  These somatic complaints are likely to be chronic and accompanied by fatigue and weakness that renders her incapable of performing even minimal role expectations."  *Id.*  Dr. Ribbler further concluded that Claimant "reports a number of difficulties consistent with a significant depressive experience."  *Id.*

Despite these problems, Dr. Ribbler noted that Claimant self-reported "no significant problems" in the areas of antisocial behavior, problems with empathy, undue suspiciousness or hostility, extreme moodiness and impulsivity, unusually elevated mood or heightened activity, marked anxiety, or alcohol or drug abuse or dependence.  Tr. 316.  Moreover, Dr. Ribbler concluded that Claimant's interpersonal scales reflected scores in the average range, and her assertiveness, friendliness, and concern for others is typical for that of normal adults.  *Id.*  Likewise, Claimant's "reasonably low stress environment and the intact social support system are both favorable prognostic signs for future adjustment."  *Id.*

As for Claimant's suicidal ideation, Dr. Ribbler reported that Claimant "has improved somewhat and is not currently feeling desperate and hopeless to the degree that she would consider self harm.  Also, her strong religious beliefs preclude her from carrying out such an act."  Tr. 316.  Without elaboration, Dr. Ribbler further opined that Claimant's inability to work has contributed to

-19-

much of her psychological distress.  Tr. 317.  He concluded that Claimant "is overwhelmed and preoccupied with her physical functioning, managing her pain, trying to manage expected role behaviors and has been frustrated with doctors who have not always validated her condition or offered the most effective treatment.  There is some element of anxiety, but more importantly, there are times when her efforts to control anxiety are maladaptive." *Id.*

Finally, Dr. Ribbler proposed three conclusions as a result of his four December, 2005, days of testing and his interview of Claimant: (1) Claimant is a "good candidate for psychotherapy targeting . . . depression and management of pain and other physical symptoms related to her condition.  Use of cognitive therapy and relaxation training should also be useful . . . ;" (2) "[m]ultimodal medical treatment of pain is appropriate, using analgesic medication, physical therapy as appropriate, with passive and active modalities, and antidepressant medication as needed as well, both adjunctive for pain and to treat her depression;" and (3) Claimant "cannot work because of her physical and psychological impairment." Tr. 317-18.  In short, Dr. Ribbler diagnosed Claimant with major depression, recurrent and severe without psychotic features, as well as a somatization disorder and cognitive disorder not otherwise specified, finding her Global Assessment of Functioning ("GAF") score to be a 50 at that time.  Tr. 318.

Following the battery of psychological testing performed by Dr. Ribbler, Claimant next saw Dr. De Ayala on January 16, 2006.  Tr. 281.  As he had on prior occasions, Dr. De Ayala assessed Claimant as suffering from lumbago, sciatica, cervicalgia, neuralgia/neuritis, and anxiety states – NOS.  Tr. 301.  Claimant advised Dr. De Ayala of no new complaints at this appointment.  Tr. 281.

The following month, Claimant visited Dr. Ribbler on February 10, 2006, Dr. De Ayala on February 16, 2006, and Dr. Ribbler again on February 20, 2006.  Tr. 307, 280.  Dr. Ribbler described

Claimant's February 10, 2006, appointment as Claimant's "initial therapy session."  Tr. 307.

According to his notes, Dr. Ribbler used the appointment to begin evaluating and educating Claimant

on psychiatric factors in pain.  *Id.*  He also encouraged Claimant to engage in more leisure activities

with her spouse.  *Id.*  As for Claimant's appointment with Dr. De Ayala, Claimant complained of

feeling tired, unworthy, and under-achieving, although Dr. De Ayala opined that Claimant was not

suicidal.  Tr. 280.  Dr. De Ayala further noted that Claimant was seeing a psychologist for

evaluation, that she had not worked for two years, and that she found her marital problems to be

overwhelming.  *Id.*  Although he opined in his notes that she was suffering from "acute depression,"

he assessed her as suffering from lumbago, sciatica, cervicalgia, neuralgia/neuritis, and anxiety states

– NOS, and renewed her medications.  *Id.*; Tr. 299.  Four days later, Claimant again saw Dr. Ribbler.

Tr. 307.  At this time, Dr. Ribbler reviewed the results of Claimant's PAI with her.  *Id.*  Based on

the session, Dr. Ribbler noted that Claimant reported "good [follow-up] on [homework]" in that she

and her husband "went out and had fun."  *Id.*  Claimant did not see Dr. Ribbler for another four

months.  *See id.*

       In the intervening time, she was examined again by Dr. De Ayala on March 17, 2006.  Tr.

279.  Claimant reported no new complaints at this appointment.  *Id.*; Tr. 299.  On April 17, 2006,

Claimant again saw Dr. De Ayala.  Tr. 278.  She complained of increased neck and back pain and

indicated that she was "still depressed," although she did not fill her prescription for Ambien.  *Id.*

On May 18, 2006, Claimant had another appointment with Dr. De Ayala.  Tr. 277.  At this

appointment, Claimant complained that her wrist was hurting her.  Tr. 277.  Following all of these

appointments, Dr. De Ayala continued Claimant on her medication regime and again assessed her

as suffering from lumbago, sciatica, cervicalgia, neuralgia/neuritis, and anxiety states – NOS.  *See*

Tr. 277, 299, 278, 277, 298, 297.

Claimant visited both Dr. De Ayala and Dr. Ribbler on June 16, 2006. She informed Dr. De Ayala of no new complaints, but apparently told Dr. De Ayala that she had received her neurobehavioral evaluation from Dr. Ribbler. Tr. 276. As this evaluation included a finding of depressive disorder not otherwise specified, Dr. De Ayala noted that he advised Claimant to "get therapy" for this condition and "get referral from Dr. Ribbler for treatment." *Id.* Dr. De Ayala once again assessed Claimant as suffering from lumbago, sciatica, cervicalgia, neuralgia/neuritis, and anxiety states - NOS. Tr. 296. Also on June 16, 2006, Claimant had a session with Dr. Ribbler.[6] Dr. Ribbler described the appointment as a "[follow-up] for depression and chronic pain." Tr. 307. Dr. Ribbler noted that Claimant was just starting Neurontin and advised Claimant not to pursue an anti-depressant (as reportedly recommended by Dr. De Ayala) until after beginning Neurontin "to see if she gets [a] mood benefit from that." *Id.* Although Dr. Ribbler stated in his notes that he would follow up with Claimant, *id.*, the transcript contains no record of any further sessions between Dr. Ribbler and Claimant.

A month later, on July 17, 2006, however, Claimant again visited Dr. De Ayala. Tr. 275. Dr. De Ayala described Claimant's mood as "better" and indicated that she was "a little more upbeat." *Id.* Nevertheless, he reported that Claimant complained of "losing strength." *Id.* In his assessment, Dr. De Ayala concluded that Claimant suffered from all of the conditions he had previously indicated after other visits, but in addition, he also identified "[d]epressive disorder

---

[6]Dr. Ribbler's notes indicate that Claimant advised him that she had seen Dr. De Ayala the day before. Both Dr. Ribbler and Dr. De Ayala indicate in their treatment notes, however, that they saw Claimant on June 16, 2006. *See* Tr. 307, 276.

NEC."[7]

Claimant next saw Dr. De Ayala on August 17, 2006.  Tr. 274.  Claimant had "no complaints other than acid indigestion [and] gastritis," and Dr. De Ayala described Claimant's mood and "depression" as "better."  *Id.*  He further found Claimant's hands and fingers to be less swollen and her grip strength to be better in both hands.  *Id.*  Dr. De Ayala continued Claimant on her medications, adding Zantac.  *Id.*  Once again, he assessed her as suffering from lumbago, sciatica, cervicalgia, neuralgia/neuritis, anxiety states – NOS, and depressive disorder NEC.  Tr. 294.

Finally, the last records from Claimant's visits to Dr. De Ayala are from her examination on September 15, 2006.  Tr. 273.  At that time, Dr. De Ayala noted that Claimant was "applying for SSI" and that she was "seeing [a] psychologist to help [with] depression."  *Id.*  The record, however, contains no documentation of any visits to a mental health professional, including a psychologist, after Claimant's June 16, 2006, appointment with Dr. Ribbler.  Dr. De Ayala renewed Claimant's medications and assessed her as he had at the prior appointment.  *Id.*; Tr. 293.

Following these records of doctors' appointments, Claimant submitted on August 20, 1997, to one more MRI of her cervical spine.  Tr. 264.  The radiologist interpreted Claimant's cervical spine MRI as providing the following impressions: with regard to C3-4, "mild narrowing of the left neural foramen by spondylosis.  Tr. 265.  With respect to C4-5 and C5-6, "posterior mild disk bulging and spondylosis and left posterolateral spondylosis with mild narrowing of the left neural

---

[7]"NEC" stands for "not elsewhere classified."  Among other manifestations, depressive disorder NEC symptoms include "a dysphoric mood or loss of interest or pleasure in usual activities," which is "prominent and relatively persistent," and the condition is characterized by [d]epressive states usually of moderate intensity in contrast with major depression present in neurotic and psychotic disorders."  http://www.icd9data.com/2009/Volume1/290-319/300-316/311/default.htm.

foramen and effacement of the anterior epidural space.  No cord compression."  *Id.*  As to C6-7,

"small left paracentral disk herniation and mild posterior spondylosis.  No significant cord

compression or foraminal stenosis."  *Id.*

### C.   *The Hearing Before the ALJ*

The ALJ held an administrative hearing in this matter on October 11, 2006.  *See* Tr. 331-378.

Claimant was sworn, and she testified.  Among other information, Claimant stated that she suffers

from degenerative disk disease throughout her neck, which causes her difficulty in turning her head

and "excruciating" pain "100 percent" of the time.  Tr. 347.  When her neck swells, Claimant

explained, it "pinch[es] off the hearing" in her left ear.  *Id.*  Additionally, Claimant testified that her

swelled neck results in a "burning" sensation that interferes with her ability to grasp with her hands

and manipulate with her fingertips, and that her neck pain, along with her lazy eye, significantly

limits the amount of time for which she can read.  *Id.* at 337, 347, 349.  When Claimant quantified

the pain in her neck, she described it as a "nine to a ten" out of ten, although she stated that, with

medication, the pain might decrease to a seven out of ten, although the medication causes Claimant

problems at times with slurring her words and losing her train of thought.  *Id.* at 337, 348.

According to Claimant's testimony, Claimant has problems with her hands and fingers 90% of the

time.  *Id.* at 349.

In addition to her neck and resulting hand and finger problems, Claimant indicated that she

also suffers from migraine headaches approximately three times each month.  Tr. 344.  Furthermore,

Claimant explained, she experiences muscle spasms in the middle of her back.  Tr. 350.  As for her

lumbar spine, Claimant stated that she daily experiences "a lot of pain there sitting still, standing up,

lying down.  It's very difficult to get comfortable."  *Id.* at 350-51.  Claimant evaluated the pain in

her low back at a level of "seven to a nine" out of ten.  *Id.* at 351.

  With regard to Claimant's legs, Claimant testified that she suffers from numbness in both legs.  Tr. 352.  As a result, Claimant stated, her leg has "given out" on occasion, causing her to fall.  *Id.*  Besides the numbness, Claimant said that she also feels pain in her legs that she rates as a "five to maybe, . . . seven" out of ten.  *Id.* at 353.  In elaborating on the condition of her legs, Claimant testified that she has two "bad knees" where "the knee will pop out" several times a year because, according to Claimant, there is no cartilage to hold the kneecap in place.  *Id.*  When her knee "pops out," Claimant explained, she falls, resulting in swelling and requiring several days to return the knee to its proper location.  *Id.* at 354.  If Claimant does not fall as a result of a "pop-out," Claimant considers the pain resulting from such a "pop-out" to rate a five out of ten.  *Id.*

  As a result of Claimant's medical problems, Claimant testified, she has been depressed.  Tr. 354.  Claimant explained that she does not leave the house, take telephone calls, or have visitors.  *Id.* at 355.  Additionally, Claimant indicated that she cries about four times each week for 20 minutes to an hour.  *Id.*  In this regard, Claimant stated that she has thought about killing herself.  *Id.* at 356.  More specifically, Claimant said that she daily considered committing suicide around 2003, but now it occurs to her on an approximately bi-monthly basis, as a result of "appropriate pain management."  *Id.*  Along with her depression, Claimant testified that she experiences panic attacks approximately 15 times each month.  *Id.* at 358.

  Because of all of these conditions, Claimant indicated, she drives less than five miles less often than once each week.  Tr. 361.  Claimant does not do the food shopping or engage in any hobbies, although previously, she played billiards, went for rides with her husband on his boat, read, socialized with her friends, went to the beach, and attended movies.  *Id.* at 362.  Despite her

problems, however, Claimant stated that she does some cooking, although she described it as "very little." *Id.*  Similarly, Claimant washes and dries "small loads" of laundry.  *Id.* at 363.  Claimant also indicated that "occasionally" she goes out to dinner with her family, although she takes her own car so she can leave right after dinner.  *Id.* at 366.  Nevertheless, she explained that she is "sure that [she is] difficult to get along with. [She] can get snappy and short-tempered."  *Id.* at 357.

According to Claimant, she has modified her dress so that she no longer wears buttons and zippers, enabling her to dress herself.  Tr. 363.  When Claimant discussed her physical abilities, Claimant stated that she can walk for approximately 10 minutes before she must stop, and standing in one place is "worse than walking."  *Id.* at 364.  As for sitting, Claimant testified that she can sit upright for "no more than 15 minutes consecutively."  *Id.*  The heaviest item Claimant indicated she can lift is a half-gallon of milk.  *Id.* at 365.

### D.        *The ALJ's Decision*

The ALJ rendered his decision on November 21, 2006.  [Tr. 14].  In short, the ALJ determined that Claimant did not have a disability as defined under the Social Security Act and was not entitled to disability benefits.  More specifically, the ALJ found that although Claimant suffers from the severe combination of the impairments of a back disorder and severe pain, as well as the "not severe" impairments of rheumatoid arthritis, depressive disorder and anxiety not otherwise specified, she, nonetheless, meets no listing and retains the residual functional capacity to perform light duty work, including past relevant work as an office manager as that job is generally performed. *Id.* at 20-21.

### IV.  STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, a court's role is a limited one.

*Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983). The Commissioner's findings of fact must be affirmed if they are supported by "substantial evidence." *Id.*; *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d. 842 (1971). "Substantial evidence" is more than a scintilla of evidence but less than a preponderance and is such relevant evidence that a reasonable person might accept as adequate to support the challenged conclusion. *Id.* at 401, 91 S.Ct. at 1427; *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982). The court may not "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Bloodsworth*, 703 F.2d at 1239. The scope of review is limited to an examination of the record only. *Reynolds v. Secretary of HHS*, 707 F.2d 927 (6th Cir. 1983). If the ALJ's decision is supported by substantial evidence, the reviewing court must affirm the decision, "even if the proof preponderates against it." *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)). In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, the court must determine whether the ALJ properly applied the correct legal standards. *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 (11th Cir. 1982).

## V.   ANALYSIS

### A.   *The Sequential Evaluation and Its Application by the ALJ*

Initially, a claimant has the burden of establishing that she is disabled under the Social Security Act. *Walden*, 672 F.2d at 838; *Hargis v. Sullivan,* 945 F.2d 1482, 1489 (10th Cir. 1991). A "disability" is defined as an inability . . .

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  In determining the merits of a claim for benefits, the court must consider the evidence as a whole, including: 1) objective medical facts or clinical findings; 2) diagnoses of examining physicians; 3) subjective evidence of pain and disability as testified to by the claimant and corroborated by other witnesses; and 4) the claimant's age, education, and work history. *Walden*, 672 F.2d at 839.

*Step One.*  To arrive at a determination as to disability, the ALJ must undertake the five-step sequential evaluation embodied in 20 C.F.R. § 404.1520.  This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b).  If so, a finding of "no disability" is made.  If the claimant is not engaged in such activity, then the ALJ must proceed to the second step of the sequential evaluation.

As a threshold matter, the ALJ determined that Claimant met the disability insured status requirements of the Social Security Act on March 15, 2004, the alleged onset date, and is insured for disability benefits through December 31, 2008.  Tr. 14, 16.  The ALJ then applied the facts, as he found them, to the sequential evaluation framework.  At Step One, he found that Claimant has not engaged in substantial gainful activity from the date of onset.  Tr. 16.

*Step Two.*  At the second step, the ALJ must determine whether the claimant suffers from a "severe impairment" or combination of impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  If the ALJ concludes that none of the claimant's impairments are medically severe, the ALJ will consequently find that the claimant is not disabled; if, however, the ALJ concludes that the claimant's impairments are medically severe, then the ALJ

-28-

will proceed to the next phase of the analysis.  *Id.*  Here, the ALJ found that Claimant suffered from the severe combination of impairments of a back disorder and severe pain, as well as the "not severe" impairments of rheumatoid arthritis, depressive disorder, and anxiety not otherwise specified.  Tr. 16.

*Step Three.*  The third step requires the ALJ to consider the "medical severity of [the claimant's] impairments" in order to determine whether the claimant's impairment meets or equals those listed in Appendix I of the Regulations.  20 C.F.R. § 404.1520(d).  Although the list is too voluminous to set forth here, the listings help to identify those claimants whose medical impairments are so severe that it is likely that they would be found disabled regardless of their vocational background.  *Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297 (1987).  If the ALJ concludes that the impairments meet or equal one of those listed and meet the duration requirement, the ALJ will find the claimant disabled without considering age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(iii) & (d).  If not, the inquiry will proceed to the next stage.

In this case, the ALJ determined that Claimant did not have an impairment or combination of impairments listed in, or medically equal to one listed in 20 C.F.R. Part 404, Subpart B, Appendix 1.  Tr. 16.  Accordingly, to find Claimant disabled, the ALJ needed to proceed to the next step in the analysis.

*Step Four.*  This step requires that the ALJ determine whether the claimant has the "residual functional capacity" to perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  The Regulations define "residual functional capacity" ("RFC") as what an individual can still do despite any limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a).  This determination takes into account "all relevant evidence," including the medical evidence, the claimant's own testimony,

and the observations of others.  *Id.*  The ALJ must then compare the RFC to the demands of the previous employment to determine whether the claimant is still capable of performing that kind of work.  If so, the ALJ will conclude that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv) & (f).

Here, the ALJ assessed Claimant's residual functional capacity.  Tr. 17-21.  In making this assessment, the ALJ considered Claimant's subjective complaints, as well as the medical documentation of record.  *Id.*  After evaluating this information, the ALJ concluded that "[C]laimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but . . . [C]laimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ."  Tr. 20.  The ALJ also carefully considered all of the medical opinions in the record regarding the severity of Claimant's impairments and found that the opinions of Dr. Grossman, Claimant's treating physician, and Dr. Ribbler, the psychologist who evaluated Claimant and saw her for three therapy sessions, but accorded them "little weight."  *Id.* at 20-21.  With respect to Grossman's opinion, the ALJ found them to be "conclusory and inconsistent with the contemporaneous treatment notes from Dr. Grossman himself," as well as "other substantial medical evidence of record," and noted that Dr. Grossman had not seen Claimant for more than a year at the time that he offered his medical opinion.  *Id.*  As for Dr. Ribbler, the ALJ pointed out that Claimant had been referred to Dr. Ribbler by her attorney, not a treating doctor.  Additionally, the ALJ described Dr. Ribbler's conclusions as "not well supported by medically acceptable clinical findings" and "inconsistent with the medical evidence of record."  *Id.* at 20.  More specifically, the ALJ opined that Dr. Ribbler based his conclusions "heavily upon the self reports" of Claimant, and contrary to Dr. Ribbler's opinions, the medical findings in the record were

"essentially normal." *Id.* at 20-21.

Based on his evaluation of the evidence of record, the ALJ determined that Claimant is capable of performing past relevant work as an office manager, as that work is generally performed. Tr. 21. The ALJ further concluded that the office manager job requires "light exertional work activity" as the job is generally performed.

*Step Five.* Where, as in this case, the ALJ concludes that a claimant is capable of performing past relevant work, the analysis ends there. If, on the other hand, the ALJ had determined that Claimant could not perform her past relevant work, the burden then would have shifted to the Commissioner to demonstrate that there exists other substantial gainful employment in the national economy that the claimant can perform. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *Smith v. Schweiker*, 646 F.2d 1075, 1077 (5th Cir. 1981). If the Commissioner proffers possible alternative employment, the burden returns to the claimant to prove an inability to perform those jobs. *Id.* These shifting burdens comprise the fifth and final step, at which point the ALJ must resolve whether the claimant is actually capable of performing other gainful and substantial work within the economy. 20 C.F.R. § 404.1520(f). Essentially, the ALJ must determine whether other work that the claimant has the ability to perform exists in significant numbers in the national economy. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. If the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled. Because the ALJ in the case under review determined that Claimant retains the residual functional capacity to perform past relevant work, however, the ALJ did not reach the fifth step of the sequential analysis.

**B.**     ***Whether Substantial Evidence Supports the ALJ's Decision***

As mentioned above, Claimant alleges effectively four separate errors in the ALJ's decision: (1) the Commissioner erred in according little weight to Dr. Grossman's opinion; (2) the Commissioner erred in according little weight to Dr. Ribbler's opinion; (3) the ALJ erred in concluding that Claimant could return to her past relevant work as generally performed; and (4) the Commissioner erred in his evaluation of Claimant's credibility.  The Court considers each objection in turn.

**1.**     ***Substantial Evidence Supported the Weight Accorded Dr. Grossman's Opinion by the ALJ***

Claimant argues that the ALJ should have given the opinion of Dr. Grossman controlling weight. D.E. 13-3 at 6.  In furtherance of this position, Claimant argues that Dr. Grossman's treating records, as well as the other medical evidence of record, support Dr. Grossman's conclusions and require that the ALJ accord Dr. Grossman's opinion controlling or substantial weight, or, at the very least, "great" weight.  *See id.* at 4-7.

Under Social Security regulations, an ALJ must consider many factors when weighing a medical opinion.  *See* 20 C.F.R. §404.1527.  Among others, for example, the ALJ should account for the examining relationship, the treatment relationship, whether an opinion is amply supported, whether an opinion is consistent with the record, and the doctor's specialization.  20 C.F.R. §404.1527(d).  As a general rule, in Social Security cases, "the opinions of examining physicians are given more weight than non-examining physicians, the opinions of treating physicians are given more weight than non-treating physicians, and the opinions of specialists (on issues within their expertise) are given more weight than non-specialists." *Kerwick v. Comm'r of Social Security*, 154

Fed. Appx. 863, *1 (11th Cir. 2005) (citing §404.1527(d)(1)-(2), (5)).

Indeed, the Eleventh Circuit has held repeatedly that the opinion of a treating physician must be accorded "substantial or considerable weight unless 'good cause' is shown to the contrary." *See, e.g., Pritchett v. Commissioner of Social Security,* 2009 WL 449177, *2 (11th Cir. Feb. 24, 2009); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *MacGregor v. Bowen*, 786 F.3d 1050, 1053 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961-62 (11th Cir. 1985). "Good cause" exists when any of the following three circumstances arise: (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory and inconsistent with the offering doctor's own medical records. *Lewis,* 125 F.3d at 1440. A failure by the ALJ to articulate the reasons for according a treating physician's opinion less than substantial weight constitutes reversible error. *Id.* Nevertheless, once an ALJ states an accepted reason or reasons why he chooses to discredit a treating physician's opinion, the Court may consider the evidence of record in determining whether substantial evidence supports the ALJ's determination in that regard. *See Broughton*, 776 F.2d at 962; *see also Milner v. Barnhart*, 275 Fed. Appx. 947, 948 (11th Cir. 2008).

In this case, as noted above, on October 21, 2005, a year and one-half after last examining Claimant, Dr. Grossman prepared a physical capacities evaluation for Claimant. *See* Tr. 228. In this assessment, Dr. Grossman opined that Claimant could sit and stand and/or walk for one hour on a sustained basis in an eight-hour work day. *Id.* He further concluded that Claimant could occasionally lift up to ten pounds, but never lift more. *Id.* Although Dr. Grossman indicated that Claimant could engage in simple grasping, he determined that she could neither push nor pull arm controls, nor engage in fine manipulation on a sustained basis. *Id.* Similarly, Dr. Grossman indicated that Claimant could not use her feet for repetitive movements on a sustained basis and that

-33-

she required one hour of rest for each hour of activity.  *Id.*  In October, 2006, Dr. Grossman also provided the Commissioner with his written opinion that Claimant's symptomatolgy became severe enough to preclude sustained full-time work.  Tr. 323.

The ALJ accorded Dr. Grossman's opinion little weight, finding his determinations to be conclusory and inconsistent with his contemporaneous treatment notes, as well as with other substantial medical evidence of record.  Tr. 21.  More specifically, the ALJ's decision notes that as of April 15, 2004, the last time Dr. Grossman examined Claimant, Dr. Grossman "stated that there was not very much on the lumbar spine MRI although the claimant did have degenerative dis[k] disease at multiple levels.  It was noted that the claimant had been calling Dr. Grossman wanting him to increase her Oxycontin.  The doctor stated that he was not comfortable doing this.  Physical examination was nonfocal and preserved."  Tr. 21.  The ALJ further expressly stated that he engaged in "careful consideration of all the evidence" and "careful consideration of the entire record."  Tr. 14, 16.

The Court finds the ALJ's determination to be supported by substantial evidence.  First, the Court addresses the conclusory nature of Dr. Grossman's October 21, 2005, assessment.  A thorough review of the October 21, 2005, evaluation and the October, 2006, statement reveals that, for the most part, they contain no comments or explanations regarding the checked-off conclusions Dr. Grossman reached in them.  *See* Tr. 278-29.  Moreover, the limited handwritten comments do not provide any support for the conclusions identified by Dr. Grossman in his evaluation.  Instead, the comments include statements such as "difficult to hear out [of] [left] ear," which does not explain why Dr. Grossman opined that Claimant needs one hour of rest for each hour of activity.  *See* Tr. 229.  Another comment refers to "muscle spasm," but provides no information regarding the

location, frequency ,or severity of such problems.  *Id.*  Nor does it purport to explain how "muscle spasm" interferes with Claimant's abilities to sit, stand, walk, push and pull leg controls, or any other limitations Dr. Grossman identified in his assessment of Claimant's physical capabilities.  *See id.*  Rather, reviewing the two-page evaluation provided by Dr. Grossman substantiates the ALJ's determination that Dr. Grossman's opinions expressed therein were "conclusory."

As for the ALJ's statement that Dr. Grossman's opinions were "inconsistent with his contemporaneous treatment notes," Tr. 21, the Court similarly finds itself in agreement with the ALJ.  Dr. Grossman saw Claimant over at least a seven-year period.  *See* Tr. 230-51.  While, as Claimant argues, it is true that Dr. Grossman recognized that certain aspects of the 1997 cervical MRI "certainly would explain neck pain" in Claimant, D.E. 13-3 at 4 (citing Tr. 250-52), later in the same letter where Dr. Grossman made this statement, he further opined, "The examination again on this patient is quite normal.  There is no real true neuropathology seen nor any true restriction or spasm though obviously the MRI scan tends to acknowledge a slight degenerative process. . . .  I have told the patient she is free to return as needed but I don't believe any further neurological care would be warranted . . . ."  *Id.*  Similarly, in the years of appointments following this one, Dr. Grossman regularly characterized Claimant's neck as "supple" and her examinations as "normal," noted that he observed no spasms, and stated that she was in "no acute distress."  *See, e.g.,* Tr. 234-44; 158.

In fact, throughout his years of seeing Claimant, Dr. Grossman consistently discussed Claimant's symptoms in terms plainly contradicted by his findings in the October 21, 2005, assessment he prepared.  On January 30, 2001, for example, Dr. Grossman suggested that Claimant "again may wish to be seen by a pain management specialist to address her chronic neck and back aches which do[] not seem to reflect ongoing neuropathology."  Tr. 240.  Likewise, on July 6, 2001,

Dr. Grossman stated, "I don't believe I see any objective findings at the present time, except for discomfort. She is seeing a therapist who suggested she go on some Prozac and felt a lot of her complaints were supratentorial, but this remains to be seen." Tr. 238. Indeed, even after Claimant's last appointment with Dr. Grossman, Dr. Grossman opined, "I looked at [the March 4, 2004] MRI scan of [the] lumbar spine and don't think there's very much there although she does have degenerative dis[k] disease at multiple levels. . . .The patient has been calling me wanting me to increase her OxyContin[,] which I'm not really comfortable doing. . . . I'm really not comfortable continuing to see her." Tr. 230. In short, although Dr. Grossman's notes refer to and substantiate some physical difficulties of which Claimant complained while being seen by Dr. Grossman, these problems in no way account for Dr. Grossman's conclusions on the October 21, 2005, assessment. Particularly when viewed in light of the general tenor of Dr. Grossman's notes, which find relatively minimal objective corroboration of Claimant's alleged symptoms, Dr. Grossman's October 21, 2005, evaluation is actually contradicted by his own medical records.

Finally, with respect to the "other substantial" medical evidence of record, Dr. Grossman's October 21, 2005, assessment is likewise inconsistent with such materials. Claimant first points to the cervical MRIs in 2000 and 2001 as providing support for Dr. Grossman's opinions expressed in the assessment. D.E. 13-3 at 4 (citing Tr. 162). With regard to the 2000 cervical MRI, Dr. Grossman's notes reflect that he reviewed that image. *See* Tr. 240. Although Dr. Grossman reported that the MRI scans showed moderate C5-6-7 degenerative disk disease, he, nonetheless, concluded, "I . . . suggest that she again may wish to be seen by a pain management specialist to address her chronic neck and back aches which do[] not seem to reflect ongoing neuropathology." *Id.*

As for the 2001 MRI results, despite a thorough review of the record, the Court has been

-36-

unable to locate such an MRI report. Nevertheless, in the notes from the only appointment Claimant had with Dr. Goldberg for which the transcript contains a record, Dr. Goldberg referred to an August, 2001, MRI as showing cervical dis[k] herniation at C6-7 to the left.[8]  Tr. 162.  Following Dr. Goldberg's description of the August, 2001, MRI, however, Claimant returned to Dr. Grossman. As noted previously, Dr. Grossman's records from after August, 2001, do not support a finding that Claimant's impairments were so debilitating as to limit her work abilities as set forth in Dr. Grossman's October 21, 2005, evaluation.

Claimant also directs the Court to the findings of her rheumatologist, Dr. Waters.  The bulk of Dr. Waters's notes, however, address Claimant's joint pain, as opposed to her spinal condition, which Dr. Grossman treated.  Moreover, Claimant visited Dr. Waters only for the eight-month period from May 30, 2002, through January 23, 2003.  *See* Tr. 123-33.  During this time, Dr. Waters found that although Claimant's range of motion in her spine was decreased, all other ranges of motion were normal, as were all muscle strengths and Claimant's gait.  Tr. 135-37.  He further opined that Claimant was "coming down with rheumatoid arthritis."  Tr. 133.  By Claimant's last visit to Dr. Waters, Dr. Waters stated that Claimant's rheumatoid arthritis was "doing well."  Tr. 122.  He

---

[8]A review of Dr. Goldberg's notes reflects that he recommended that Claimant participate in physical therapy to address her pain, and that if physical therapy did not work adequately, that she receive epidural steroid injections.  Tr. 162.  Nothing in the record indicates that Claimant complied with Dr. Goldberg's recommendations and participated in physical therapy or received epidural injections.  However, although "'[a] medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling,'" *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988) (citing *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987)), in order for an ALJ to deny benefits on the basis of failure to follow a prescribed treatment, the ALJ must make specific factual findings, supported by substantial evidence, that had the claimant followed the prescribed treatment, the claimant's ability to work would have been restored.  *Id.* (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)).  Here, the ALJ made no such finding and the record similarly lacks substantial evidence to support such a conclusion.

further described Claimant as having Chronic Pain Syndrome, which was also "doing well." *Id.*

With regard to Dr. De Ayala, while Claimant notes that he diagnosed lumbago, sciatica, cervicalgia, and neuralgia and prescribed pain medications, there is nothing about this fact that dictates the conclusions set forth by Dr. Grossman in his October 21, 2005, assessment of Claimant, or his October, 2006, opinion. Rather, Dr. De Ayala merely entered general categories of diagnosis on his "pain management encounter ticket[s]" for billing purposes. Claimant points to no specific findings by Dr. De Ayala regarding the severity of the conditions diagnosed or supporting Dr. Grossman's conclusions that Claimant is physically unable to work.

As for Claimant's reference to Dr. Morrison's observation that Claimant demonstrated an unsteady gait and had mild neck pain with rotation and her diagnosis of cervical radiculopathy and back pain, D.E. 13-3 at 5, nothing about these findings requires Dr. Grossman's conclusions that Claimant can sit, stand, or walk for only one hour on a sustained basis and must have an hour of rest for each hour of activity, or any of the other limitations Dr. Grossman expressed in the assessment. To the contrary, the entire quotation states, "She was able to tolerate[] range of motion even though it evoked minor pain to her neck only with rotation." *Id.* Quite simply, such a conclusion does not support Dr. Grossman's opinions in his October 21, 2005, assessment, requiring a conclusion that Claimant cannot work. Moreover, just as Dr. Grossman's actual treatment notes reflect, at the time of Dr. Morrison's examination of Claimant, Claimant was in no acute distress, and her neck was supple. Tr. 174. Dr. Morrison also described Claimant's back as having "[n]ormal curvature" with "[n]o spinous process redness, heat, swelling or inflammation." *Id.* She found Claimant's straight-

-38-

leg raise to be complete and concluded that Claimant could turn a doorknob with both hands.[9]  Tr. 175.  Significantly, Dr. Morrison characterized Claimant's range of motion as "[n]ormal," without qualification.  *Id*.  These findings do not support the severe limitations on Claimant's ability to work expressed as opinions by Dr. Grossman in his October 21, 2005, assessment of Claimant or his October, 2006, opinion.  Furthermore, the ALJ expressly identified these findings of Dr. Morrison's in his analysis of Claimant's condition.  *See* Tr. 19.  In short, substantial evidence supports the ALJ's conclusion that Dr. Grossman's October 21, 2005, evaluation and October, 2006, opinion should be given little weight, as they are conclusory, the findings are contrary to Dr. Grossman's treating notes, and the opinions run counter to the other medical evidence of record.

## 2.   *Substantial Evidence Supported the Weight Accorded Dr. Ribbler's Opinion by the ALJ*

As the Court has already set forth the standards applicable to an ALJ's review of an examining physician's medical opinions, *see supra* at V.B.1, the Court proceeds to application of these principles to the second issue raised by Claimant – Claimant's argument that the ALJ improperly failed to accord controlling or substantial weight to Dr. Ribbler's opinion.  As noted previously, among other conclusions, Dr. Ribbler opined after his four days of testing Claimant in December, 2005, that Claimant "cannot work because of her physical and psychological impairment." Tr. 317-18.  The ALJ discounted Dr. Ribbler's conclusion, identifying several reasons:

---

[9]Claimant argues that Dr. Morrison's statements regarding Claimant's abilities to turn a doorknob reflect that Dr. Morrison concluded that Claimant could turn a doorknob only using both hands simultaneously.  D.E. 13-3 at 6.  The statement, however, is also susceptible to a different interpretation.  The ALJ obviously understood Dr. Morrison's statement to mean that Claimant could turn a doorknob using each hand independently.  *See* Tr. 19.  This interpretation was a reasonable one under the circumstances, particularly considering, as the ALJ pointed out, that Dr. Morrison found Claimant's grip strength in both her left and right hands to be 5/5.  *Id.; see also* Tr. 175.

(1) Claimant was referred by her attorney, not a treating doctor; (2) the opinion was not well supported by medically acceptable clinical findings; (3) the opinion was inconsistent with the medical evidence of record; (4) Dr. Ribbler based his conclusions "heavily upon the self[-]reports of the claimant;" and (5) the medical findings in the record were essentially normal.

The Court begins with the ALJ's first point. Claimant argues that "the fact that [Claimant's] attorney referred her to Dr. Ribbler does not diminish the weight given to his opinion or make it any less credible." D.E. 13-3 at 9. In support of this position, Claimant cites *Miles v. Chater*, 84 F.3d 1397 (11th Cir. 1996). In *Miles*, the claimant's attorney referred her to a psychiatrist and a physician [Dr. McClain] for evaluation. Both doctors gave opinions supporting a finding of disability, although evaluations performed by medical health professionals consulting for the agency arrived at different conclusions. The ALJ accorded little weight to the claimant's physicians, stating, among other reasons, that Dr. McClain's examinations for Mr. McCluskey [the claimant's attorney] almost invariably conclude that the person being examined is totally disabled." 84 F.3d at 1399. The ALJ cited no evidence in the record supporting this statement. After considering the facts, the Eleventh Circuit held the ALJ's comments, without any record evidence supporting them, demonstrated that the full and fair process to which each Social Security applicant is entitled had been compromised, and the claimant was entitled to a fresh reconsideration before a different ALJ.

Although the Court recognizes that the fact that a claimant's attorney referred a claimant to a particular doctor for treatment is not, on its own, a reason to discount that physician's opinion, such a circumstance is not necessarily altogether irrelevant. First, it is relevant that although Claimant saw a number of other doctors regularly – including Dr. De Ayala, who had assessed Claimant as suffering from anxiety states and had even prescribed medication for Claimant for the condition,

none of these physicians apparently viewed Claimant's mental health issues as serious enough to refer her to a mental health professional. Second, the circumstances of how Claimant got to Dr. Ribbler, when viewed against the number of times she saw him and the nature of those visits, may factor into whether Dr. Ribbler may accurately be considered a "treating physician," as opposed to an evaluating physician.

As discussed previously, under Eleventh Circuit case law, the opinions of a treating physician are entitled to more weight than those of a consulting or evaluating health professional. This is because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §404.1527(d)(2).

Here, the circumstances surrounding Claimant's visits to Dr. Ribbler demonstrate that Dr. Ribbler was not serving as a treating physician for Claimant at the time that he rendered his opinion in this case. With respect to the neuropsychological evaluation performed by Dr. Ribbler on Claimant, Dr. Ribbler had Claimant take tests and submit to an interview at appointments spread out over four days in December, 2005. *See* Tr. 308. Prior to this time, the record suggests that Claimant had never met with Dr. Ribbler.[10] *See id.* (indicating she was referred by her attorney).

Nothing, however, speaks as clearly to the question of Dr. Ribbler's role as Dr. Ribbler's own

---

[10]After the December, 2005, evaluation, Claimant met with Dr. Ribbler on three more occasions: February 10, 2006; February 20, 2006; and June 16, 2006. The Court need not consider whether Dr. Ribbler became Claimant's treating physician at some later point in time as a result of these sessions, however, because they all occurred *after* Dr. Ribbler prepared the evaluation at issue.

statement regarding the purpose of the referral, and, consequently, of the testing and interview conducted over the appointments on the four days in December, 2005.  In this regard, Dr. Ribbler's evaluation reflects on its face that he understood his role as requiring him "to determine the nature and severity of cognitive and psychological impairment, as well as to evaluate pain related disability and help with a determination as to [Claimant's] ability to work."  Tr. 308.  Although Dr. Ribbler's recommendations contained at the end of his evaluation suggest that Claimant is a good candidate for psychotherapy, *see* Tr. 317, his description of the purpose of the encounter in the first place contains no mention of treatment or even of a potential future role for Dr. Ribbler in Claimant's mental health.  Instead, it refers solely to assessing any impairments and disabilities of Claimant for purposes making a determination about Claimant's ability to work.    Thus, Dr. Ribbler's characterization of how he viewed his role at the time that he conducted the evaluation of Claimant strongly indicates that he considered himself not as a treating physician, but rather, as an examining or consulting doctor.[11]  Under the circumstances of this case, the Court agrees.  Because Dr. Ribbler was not a treating physician at the time that he opined on Claimant's impairments, his opinion is not entitled to controlling weight.  *See Casher v. Halter*, 2001 WL 394921, *13 (S.D. Ala. Mar. 29, 2001).  Consequently, any failure by the ALJ to accord controlling weight to Dr. Ribbler's opinion – even if the ALJ did not specify the reasons for discrediting Dr. Ribbler's assessment – could not have constituted error.

---

[11]Dr. Ribbler's treatment notes for Claimant for February 10, 2006, provide further confirmation that Dr. Ribbler considered himself an evaluating physician, as opposed to a treating physician, at the time of the December testing and interview.  In the February 10, 2006, notes, Dr. Ribbler described the appointment as "**[i]nitial** therapy session."  Tr. 307 (emphasis added).  In other words, until February 10, 2006, he did not consider himself to be treating Claimant.

Nevertheless, even assuming, *arguendo*, that Dr. Ribbler had been serving as a treating physician at the time that he rendered his December, 2005, opinion, Dr. Ribbler's assessment still would not necessarily be entitled to controlling weight.  For example, at least one of the factors enumerated at 20 C.F.R. §404.1527, the relative shortness of Dr. Ribbler's treatment relationship with Claimant – even using December 5, 2005, the first day of testing, as the first day of treatment – would have gravitated in favor of according Dr. Ribbler's opinion less weight than that to which it might otherwise be entitled.

Moreover, the additional reasons stated by the ALJ for giving Dr. Ribbler's opinion little weight provide further good cause for the ALJ not to have accorded Dr. Ribbler's assessment controlling weight, even had he been a treating source at the time of his evaluation.  Among other reasons cited by the ALJ for giving Dr. Ribbler's opinion little credit, the ALJ emphasized that Dr. Ribbler's conclusions were "based heavily upon the self reports of the claimant." Tr. 21.  A review of Dr. Ribbler's report shows this to be accurate.  First, Dr. Ribbler supported his conclusions in significant part with information he obtained through the clinical interview of Claimant.  *See, e.g.,* Tr. 308-09.  In this regard, however, the Court notes that Dr. Ribbler's report does not appear to be entirely consistent with the notes he took of Claimant's interview.  While Dr. Ribbler's report states that "in the past, [Claimant] has enjoyed boating and going out to eat," Tr. 308, for example, his notes indicate that as of the time of the interview, Claimant represented that she continued to engage in boating and going out to eat." Tr. 320.  Along the same lines, Dr. Ribbler inconsistently described his observations of Claimant's physical limitations.  Originally, for instance, he stated that during testing Claimant needed to take breaks to stand up and move around approximately every twenty minutes, Tr. 310, but in discussing Claimant's attentional functions, Dr. Ribbler indicated that

Claimant "was able to work for periods of up to about thirty minutes before requiring a break to get up and move around."  Tr. 312.

Moreover, although Dr. Ribbler administered tests to Claimant, some of these tests were similarly dependent upon Claimant's self-reporting, such as the McGill Pain Questionnaire and the Pain Drawing.  *See* Tr. 314.  While Dr. Ribbler offered his view that Claimant's responses on these tests resulted in a valid profile, *see id.*, it is noteworthy that upon considering Claimant's testimony at the hearing regarding her pain and symptoms, the ALJ expressly stated that he found her not to be entirely credible.  *See* Tr. 20.

In addition, Dr. Ribbler's discussion of Claimant's other test results are, as the ALJ found, "essentially normal."  Tr. 21.  With respect to general intellectual ability, for example, Dr. Ribbler opined that Claimant fell within the average range.  Tr. 311.  In fact, Dr. Ribbler found that Claimant had a "strong working memory."  *Id.*  He similarly described Claimant as experiencing "no difficulty with conversational speech."  And, although Dr. Ribbler characterized Claimant's performance on the Test of Perceptual Organization as "suggesting some difficulty following specific written instructions as well as reading comprehension," Tr. 312, when it came time for Claimant actually to demonstrate her skills in this regard, Dr. Ribbler found that Claimant "was able to follow test instructions without any particular difficulty."  *Id.*  As for Claimant's attentional and memory functions, Dr. Ribbler again concluded that they fell within the average range.  Tr. 312-13.  Indeed, with the exception of Claimant's fine motor speed and coordination, which Dr. Ribbler opined was "moderately impaired with the dominant [left] hand" and visual motor coordination, which he found to be "severely impaired" relating to her copy of a complex figure, Tr. 312, the only area where Claimant's test results indicated a significant deficiency fell in the psychosocial functioning testing,

testing that is driven by the test-taker's descriptions of her own pain and feelings.  *See* Tr. 314.

Finally, with respect to inconsistencies between Dr. Ribbler's conclusions and his notes, the Court finds significant support for the ALJ's decision to accord little weight to Dr. Ribbler's opinions, in view of what happened after Claimant completed the evaluative testing for purposes of this case.  More specifically, although Dr. Ribbler opined that Claimant was "experiencing a major depressive episode," that she was "overwhelmed and preoccupied with her physical functioning, managing her pain, [and] trying to manage expected role behaviors," and that she was "a good candidate for psychotherapy targeting . . . depression and management of pain and other physical symptoms related to her condition," Tr. 317, curiously, Claimant went to only three psychotherapy sessions following Dr. Ribbler's conclusions in these regards – two of which occurred within four days of each other and a third that took place four months later.  Tr. 307.  This treatment record stands in stark contrast to Dr. Ribbler's assessment of debilitation.[12]

Turning to the other medical evidence of record, which the ALJ cited as yet another reason for discrediting Dr. Ribbler's opinion, the Court reviews the conclusions of Dr. De Ayala, who actually was consistently treating Claimant's mental health issues.  *See, e.g.,* Tr. 191, 194, 203, 293-

---

[12]Claimant also suggests that Dr. Ribbler's opinion that Claimant suffers from "somatic complaints [that] are likely to be chronic and accompanied by fatigue and weakness that renders [Claimant] incapable of performing even minimal role expectations" provides an independent basis for reversing and remanding the ALJ's decision.  *See* D.E. 13-3 at 6.  The fact that Dr. Ribbler was not serving as Claimant's treating physician at the time that he rendered this opinion is of particular significance here in that the most he could say was that Claimant was "likely" to be plagued by fatigue and weakness making her incapable of "performing even minimal role expectations."  In other words, even setting aside the "treating physician" issue, while Dr. Ribbler expressed a concern that based on Dr. Ribbler's opinion, Claimant may be incapable of working, he qualified that suggestion and did not conclude that she was, in fact, unable to work, based on the somatic complaints.  Where, as here, the record contains substantial evidence indicating the contrary, the ALJ did not err in according little weight to Dr. Ribbler's opinion in this regard.

305 (assessing anxiety states – NOS, and later, depressive disorder – NEC); 189, 193, 287-91

(showing consistently renewed prescription for Xanax[13]); 197, 201 (prescribing Xanax).  Dr. De

Ayala offered an opinion in direct conflict with that of Dr. Ribbler, finding that Claimant did not

suffer from a mental impairment that significantly interfered with daily functioning. Tr. 190.  While

it is true that Dr. De Ayala does not specialize in psychotherapy, a review of his treatment records

demonstrates that he was treating Claimant, at least in part, for her mental health issues over an

extended period of time.

Nor did other doctors seeing Claimant refer Claimant for mental health treatment.  To the

contrary, upon his examination of Claimant, Dr. Andres Patron concluded that Claimant did not

suffer from depression.  Tr. 152.  Dr. Grossman likewise did not refer Claimant for mental health

treatment.  In short, the ALJ's decision to give little weight to the opinion of Dr. Ribbler was

supported by substantial evidence, and the ALJ did not err.

### 3.   *The ALJ Did Not Err in Finding that Claimant Could Perform Her Past Work*

Claimant next objects to the ALJ's decision because the ALJ determined that Claimant could

perform her past relevant work as an office manager as generally performed, work that the ALJ

described as requiring light duty.  D.E. 13-3 at 8.  Although Claimant complains that the ALJ did

not cite any occupational codes from the *Dictionary of Occupational Titles ("DOT")* in his decision

and that the record contained no testimony regarding Claimant's past work, she concedes that the

*DOT* title that most closely matches Claimant's past work, based upon Claimant's 2006 written

---

[13]Xanax, a trade name for the drug Alprazolam, is used to treat anxiety or excessive fears
and concerns.  Anxiety associated with depression is also responsive to Xanax.
http://www.healthsquare.com/newrx/xan1491.htm.

description of her work, is that of an office manager (169.167.034) (any industry), a skilled, sedentary job.  As this job title meets the ALJ's description of Claimant's past relevant work, Claimant's objection is not directed towards a concern that the ALJ unfairly characterized Claimant's past relevant work.[14]

Instead, Claimant argues that the ALJ erred in determining that Claimant could return to work as an office manager as the job is generally performed because her "seriously limited ability to understand, remember, and carry out detailed or complex job instructions," as well as Claimant's anxiety and depression, "would prevent [Claimant] from performing her past work."  Tr. 13-3 at 8. According to Claimant, the ALJ did not assess the effect of these conditions on Claimant's ability to work.  *Id.*

The problem with Claimant's argument rests in the fact that it depends for support on Dr. Ribbler's opinion.  Indeed, nothing else in the record as much as suggests that Claimant suffers from a "seriously limited ability to understand, remember, and carry out detailed or complex job instructions."  To the contrary, as discussed above, even the results of Dr. Ribbler's own testing tend to contradict his opinion.  In this regard, Dr. Ribbler described Claimant as demonstrating a "strong working memory" and possessing a "significant strength in her ability to process verbal information."  Tr. 311.  And a review of Claimant's numerous and detailed letters contained in the record in this case provide first-hand confirmation that Claimant does not appear to be significantly

---

[14]An independent comparison of Claimant's description of her work and the *DOT* entry for office manager (169.167.034) (any industry) similarly demonstrates that the ALJ did not mischaracterize Claimant's past relevant work.  *Compare* Tr. 69 (Claimant's detailing of the duties of her past relevant work) and *DOT* entry for office manager (169.167.034) (any industry).

mentally hindered.[15]  *See, e.g.,* Tr. 90-107, 199, 200.  Some of these letters, for example, span nearly

three single-spaced pages, referring to numerous specific dates over the prior eight years and

detailing the significance of complex medical records developed on those dates or recalling

particular duties conducted on the dates to which Claimant referred in her letters.  *See, e.g.*, Tr. 100-

02 and 103-05.

As for Claimant's anxiety and depression, the ALJ's discussion of how he determined

Claimant to retain the residual functional capacity to engage in light work reveals that the ALJ did,

in fact, specifically, consider the effects of anxiety and depression on Claimant's residual functional

capacity to perform light work.  *See* Tr. 20-21 (discussing Claimant's anxiety and depression

complaints).  In this regard, the ALJ articulated why, in view of Dr. De Ayala's findings, as well as

the rest of the medical evidence of record, the ALJ discredited Dr. Ribbler's conclusions.  For the

reasons previously noted, the Court cannot find that the ALJ's decision to accord Dr. Ribbler's

opinion little weight was not supported by substantial evidence.  Because the face of the decision

makes clear that the ALJ did, in fact, consider any effects of anxiety and depression on Claimant's

residual functional capacity, the Court cannot agree that the ALJ did not assess the effects of these

impairments on Claimant's ability to return to her past relevant work in the light-duty position of

an office manager as that work is generally performed.

### 4.      *Substantial Evidence Supports the ALJ's Credibility Determination*

Finally, Claimant asserts that the ALJ erred in assessing Claimant's credibility.  D.E. 13-3

at 9.  More specifically, Claimant complains that the ALJ did not consider the objective medical

---

[15]While the ALJ did not refer specifically to Claimant's letters, he did note that he gave
"careful consideration" to "all the evidence" and the "entire record."  Tr. 14, 16.

evidence, the side effects of the medication, or Claimant's daily activities in finding Claimant not to be entirely credible.  *Id.*

In evaluating a claimant's subjective complaints, "pain testimony should be consistent with the degree of pain that could be reasonably expected from a determinable medical abnormality." *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991).  An ALJ is required to apply a three-part pain standard when a claimant attempts to establish disability through pain or other subjective symptoms.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  This standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) evidence that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.  *Id.* (citations omitted).  Thus, a claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. *See id.* at 1561.  Other possible factors for consideration include the levels of medication and their effectiveness on the Claimant, the extensiveness of the attempts to obtain relief, the frequency of medical contacts, and the nature of daily activities.  *Hargis*, 945 F.2d at 1489; *see also* 20 CFR §§ 404.1529 and 416.929.

In this case, the ALJ found evidence of underlying medical conditions, including a back disorder encompassing both the cervical and lumbar spines, rheumatoid arthritis, depressive disorder, and anxiety not otherwise specified.  *See* Tr. 16-19.  While he concluded that Claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, the ALJ did not find entire credible Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms.  Tr. 20.  Claimant asserts that the ALJ did not explain how the medical

-49-

evidence of record was inconsistent with the pain and limitations she expressed.  D.E. 13-3 at 9.

This Court disagrees.  First, Claimant points to the MRIs of her spine as supporting the severity of Claimant's pain allegations.  D.E. 13-3 at 9.  Although it is true that Claimant's MRIs show problems existing in Claimant's back, as interpreted by Claimant's own physicians, the MRIs "do[] not seem to reflect ongoing neuropathology."  Tr. 240.  Nor, after review of the MRIs, did Dr. Grossman believe that he saw "any objective findings at the present time, except for discomfort." Tr. 238.  Similarly, upon Dr. Grossman's review of the February, 2004, lumbar spine MRI scan, Dr. Grossman opined that he did not "think there's very much there although she does have degenerative dis[k] disease at multiple levels."  Tr. 230.  Likewise, Claimant stated that she had also visited Dr. Stauber, who "felt from a surgical standpoint that nothing conclusive could be gained from a surgical procedure.  He also felt the mass that was apparent on the lumbar MRI that [Dr. Grossman] had ordered for [Claimant] was composed of dis[k] fragments and no further tests or action were needed."  Tr. 199.  Thus, the MRIs cannot provide the necessary objective medical evidence that confirms the severity of Claimant's alleged pain.

Next, Claimant contends that her multiple prescription medications cause serious side effects that would hinder Claimant's ability to work, and the ALJ's decision does not take these matters into account.  D.E. 13-3 at 9-10.  Among other specific side effects, Claimant refers to slurred speech, drowsiness/fatigue, dizziness upon standing, visual disturbances, difficulty concentrating, and upset stomach with nausea and vomiting.  *Id.*  In fact, however, the ALJ's decision does address the side effects, even specifically identifying them by description.  *See* Tr. 20.  With respect to dizziness upon standing, for example, the ALJ's decision notes that Dr. Morrison concluded that Claimant was able to perform heel and toe walking, an indication of Claimant's balance abilities.  Tr. 19.  As for nausea

and gastrointestinal problems, the ALJ noted that Claimant advised Dr. Ribbler in December, 2005, that her leisure activities included boating and going out to eat – two activities that are difficult for a person with persistent nausea and gastrointestinal problems to endure.[16]  *See* Tr. 20.

The ALJ further noted that "[t]here is nothing in the medical evidence of record to support the level of the claimant's allegations." Tr. 20.  In fact, review of the record reveals additional evidence contradicting Claimant's contentions regarding the severity of her side effects.  Among others, for example, with regard to Claimant's alleged speech-slurring problems, Dr. Grossman described Claimant's speech as "fluent" and did not note any slurring.  Tr. 158.  Dr. Ribbler also found Claimant to have "no difficulty with conversational speech."  Tr. 312.  He similarly noted no speech slurring.  At the time that Dr. Ribbler conducted his testing of Claimant, she was taking precisely the medications she claimed at the hearing caused her speech-slurring problems.

As for Claimant's gastrointestinal problems, the medical evidence of record contains a reference to Claimant's experiencing gastritis in August, 2006.  *See* Tr. 274.  At this time, Dr. De Ayala prescribed Zantac for Claimant.  *Id.*  At Claimant's appointment the following month, on September 15, 2006, Dr. De Ayala did not refill the prescription for Zantac.  *See* Tr. 287.  Nor do Claimant's medical records reflect any other significant complaints of or treatment for gastrointestinal complaints.

The Court further notes that with regard to all alleged side effects, Claimant signed a document as a patient of Dr. De Ayala's in which she agreed that "[i]f [she was] feel[ing] tired or

---

[16]Although Claimant points out that Dr. Ribbler's report states that Claimant stated that in the past she enjoyed boating and going out to eat, his contemporaneous notes of his interview with Claimant indicate that she advised him in December, 2005, that as of that time, she enjoyed boating and going out to eat.  *See* Tr. 320.

mentally foggy, [she would] not drive, operate machinery or serve in any manner related to the public's safety." Tr. 212. At the hearing, however, Claimant admitted to driving. *See* Tr. 361. Although Claimant noted that she drove less than five miles per week, without driving at all some weeks, she explained her reason for not driving more as resulting from "difficulty turning [her] head." *Id.* Thus, it appears as though Claimant does not feel that her medications cause her to feel sufficiently tired or mentally foggy to prevent her from driving altogether, as Claimant pledged she would do if the medications created such problems for her. Similarly, the medications did not cause sufficient visual disturbances to preclude Claimant from driving. In short, the record lacks objective medical evidence indicating that the side effects from Claimant's prescriptions significantly interfere with Claimant's ability to function.[17]

Next, Claimant argues that the numerous records of visits to the doctor and attempts at various types of treatment support Claimant's expression of the scope of her pain. D.E. 13-3 at 10. Although the Court agrees that Claimant has seen numerous doctors, a careful review of the record does not detract from the substantial evidence supporting the ALJ's ruling finding Claimant not to be entirely credible.

First, the record indicates that Claimant saw Dr. Waters, her rheumatologist, from May 30, 2002, through January 23, 2003 – a period of approximately eight months, which ended prior to the onset of Claimant's alleged disability. The transcript contains records from two visits by Claimant to Dr. Andres Patron – one in May, 2003, and another a year later. The transcript similarly contains

---

[17]Inclusions of Claimant's self-reporting of alleged side effects in Dr. Ribbler's report alone does not constitute independent objective medical evidence, particularly in view of the fact that the purpose of Claimant's visit to Dr. Ribbler was to assess Claimant's mental health in association with her application for disability benefits.

records for only one visit by Claimant to Dr. Andrew Goldberg – on March 25, 2003, once again before the alleged onset date.  *See* Tr. 161.  Moreover, although Dr. Goldberg recommended that Claimant receive epidural steroid injections and participate in physical therapy, *see id.*, the record contains no indication that Claimant complied with these recommendations.

As for Dr. Grossman, although Claimant saw him from at least August 5, 1997, through April 15, 2004, except for the last month of this period, all of the visits occurred before the onset of the alleged disability.  Moreover, Dr. Grossman's records reflect that he advised Claimant to consider physical therapy, although the record contains no indication that Claimant actually participated in physical therapy.  *See* Tr. 164.  Additionally, by Dr. Grossman's own statement, he did not "think there's very much there [on Claimant's MRI scan]" and believed "there's very little [he could] do for her."  Tr. 230.  In fact, Dr. Grossman expressed concern that Claimant seemed to continue to see him only in an effort to cause Dr. Grossman to increase Claimant's OxyContin prescription, which he was "not really comfortable doing."  *Id.*

Next, Claimant visited Dr. De Ayala.  Claimant did see Dr. De Ayala with regularity following the alleged onset date, and he prescribed pain medications for her.  While Dr. De Ayala's regular prescriptions of pain medications for Claimant certainly lends credence to Claimant's complaints that she suffered from pain, it does not assist the Court in quantifying that pain, particularly in the absence of objective medical evidence corroborating the severity of the alleged pain arising from Claimant's condition or of any evidence in the record that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain, other than the April 21, 2005, opinion of Dr. Grossman, which the ALJ fairly chose to accord little weight.  Under these circumstances, the longitudinal medical record cannot

sufficiently support Claimant's allegations concerning her symptoms for the Court to find that the ALJ's decision is not supported by substantial evidence, in view of the other aspects of the record.

Finally, Claimant suggests that the ALJ unfairly found inconsistencies in Claimant's statements regarding her daily activities and behavior where none exist.  D.E. 13-3 at 10.  In this regard, Claimant first contests the ALJ's statement that Claimant told Dr. Ribbler that she went boating and out to eat, while testifying at the hearing that she did neither.  *Id.*  Claimant complains that the ALJ "fail[ed] to acknowledge . . . that Dr. Ribbler reported, 'In her leisure time, in the past, she has enjoyed boating and going out to eat.'"  *Id.*  As discussed previously, while Claimant is correct in noting that Dr. Ribbler's report attributed this behavior by Claimant to her past, his contemporaneous notes of his interview with her indicate just the opposite: as of the time of the December, 2005, interview, Claimant enjoyed the social activities of boating and going out to eat.  Tr. 320.  The Court cannot fault the ALJ for choosing to accept the contemporaneous notes of Dr. Ribbler over his report written later.  The contemporaneous interview notes provide substantial support for the ALJ's conclusion in this regard.

Claimant also argues that the ALJ incorrectly found Claimant's testimony regarding how she got along with her spouse and family members to be inconsistent with her answers to Dr. Ribbler. D.E. 13-3 at 10.  In this regard, Claimant asserts that Dr. Ribbler noted in his report that Claimant was irritable, tense, and tired.[18]   D.E. 13-3 at 10-11.  Once again, however, Dr. Ribbler's contemporaneous notes of his interview with Claimant contradict Dr. Ribbler's report.  In Dr. Ribbler's notes, Dr. Ribbler reported that Claimant described the way in which she got along with

---

[18]Although Claimant attributes this conclusion to Dr. Ribbler's notes of his interview with Claimant (Tr. 320), the Court has been unable to find this statement in the notes.  It has, however, been able to locate the statement in Dr. Ribbler's report.  *See* Tr. 309.

her spouse and family members as "good." Tr. 320. As with the boating and going out to eat, under these circumstances, the Court cannot find that the ALJ erred in accepting the statements from Dr. Ribbler's notes instead of his report.

Claimant contends that the ALJ's failure to fully credit Claimant's testimony should be reversed because the ALJ did not discuss the aspects of Claimant's testimony that were consistent with her prior statements to Dr. Ribbler and with the statements of Claimant's husband at the hearing. D.E. 13-3 at 11. Nothing, however, requires the ALJ to provide a line-by-line analysis of Claimant's testimony. Rather, as the ALJ heard testimony from Claimant in this case, he is in the best position to evaluate Claimant's credibility, and findings in this regard should be upheld if they are supported by good reasons and substantial evidence. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996); *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). Here, for the reasons stated previously, I find that they are. Consequently, I recommend that the Court find that the ALJ's decision is supported by substantial evidence and affirm the decision of the Commissioner.

## VI. CONCLUSION & RECOMMENDATION

Claimant had a fair hearing and a full administrative consideration in accordance with the applicable statutes and regulations. Substantial evidence supports the ALJ's findings as noted in his November 21, 2006, Notice of Decision. For the foregoing reasons, I respectfully **RECOMMEND** that Plaintiff's Motion for Summary Judgment [D.E. 13] be **DENIED**, that Defendant's Motion for Summary Judgment [D.E. 18] be **GRANTED**, and that the decision of the Commissioner be **AFFIRMED**.

The parties shall have ten (10) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William

P. Dimitrouleas, United States District Judge.  Failure to file objections timely shall bar the parties

from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the

parties from attacking on appeal the factual findings accepted or adopted by the District Court except

upon grounds of plain error or manifest injustice.  *R.T.C. v. Hallmark Builders, Inc.*, 996 F.2d 1144,

1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*,

677 F.2d 404, 410 (5th Cir. Unit B 1982) (*en banc*); 28 U.S.C. § 636(b)(1).

      **ORDERED AND ADJUDGED** at Fort Lauderdale, Florida, this 5th day of May, 2009.

                         ROBIN S. ROSENBAUM
                         United States Magistrate Judge

cc:    Honorable William P. Dimitrouleas
       Counsel of Record